In re Rex L. HAMMONS and Joan Margaret Hammons, and Donald Ray Ball and Betty Barrett Ball, d/b/a Shady Grove TV and Appliance.

**FEDDERS FINANCIAL CORPORATION,**
Appellant,

v.

**BORG WARNER ACCEPTANCE CORPORATION,** General Electric Credit Corporation, and J. C. Bell, Receiver, Appellees.

No. H76–92(B).

United States District Court,
S. D. Mississippi,
Hattiesburg Division.

Sept. 29, 1977.

Alex A. Alston, Jr., Billups S. Allen, Jackson, Miss., for appellant.

Pat H. Scanlon, Jackson, Miss., for appellees.

## OPINION OF THE COURT

DAN M. RUSSELL, Jr., Chief Judge.

This is an appeal from a judgment of the Bankruptcy Court of the Southern District of Mississippi that adjudged, *inter alia*, that appellant Fedders Financial Corporation (hereinafter FFC) had failed to properly perfect its security interest in certain collateral of the bankrupts and was, therefore, subordinate to the other secured creditor's and the trustee in bankruptcy.

The position of appellee, Borg Warner Acceptance Corporation (hereinafter BWAC) is, of course, that the bankruptcy judge was correct in his ruling invalidating the security interest of FFC and adjudging BWAC a perfected secured creditor with first priority as to the bankrupts' property. General Electric Credit Corporation (hereinafter GE) and the receiver are not involved in this appeal. Therefore, this appeal concerns the status and priorities of the two secured creditors FFC and BWAC.

This case presents a somewhat unusual and complex set of facts and circumstances. For this reason, and to better appreciate the case and the law applicable thereto, a brief history may be helpful.

During the latter part of 1974, Rex L. Hammons and Donald R. Ball were doing business, ostensibly as partners, in Raleigh, Mississippi. The parties adopted and operated under the trade name of Hammons Heating and Air Conditioning. Ball, who was then employed at a hardware store, did not take an active part in the business operation and referred to himself as a "silent partner". There is no contention by either side that Ball was merely a limited partner, and the distinction is not relevant to the issues presented herein. The two partners' business consisted primarily of sales and installation of heating and air conditioning units and systems.

On October 3, 1974, Hammons & Ball executed a security agreement with FFC to secure loans under a floor planning arrangement wherein FFC took a security interest in the debtors' presently owned and after-acquired inventory. On the same date, the partner-debtors signed and executed a guaranty obligating themselves personally for payment of any amounts owing to FFC. In addition, Hammons Heating and Air Conditioning, by Ball and Hammons, executed a signature authorization whereby Fedders' agents were appointed their attorneys in fact for the purpose of issuing trust receipts and promissory notes for goods shipped to the debtors by the Stuart C. Irby Company, a Fedders' distributor located in Jackson, Mississippi.

On October 14, 1974, FFC filed its financing statement with the Secretary of State in Jackson. This financing statement listed the debtor as follows:

Hammons Heating and Air Conditioning (a Partnership)
Rex L. Hammons & Don R. Ball (Partners)
Route 2
Raleigh, Mississippi

In the space provided for the debtors' signature, the assumed trade name and the partners' individual names were given. The financing statement was signed only by Donald R. Ball.

On October 22, 1974, FFC filed a second financing statement with the Smith County Chancery Clerk which was in all respects identical to the one filed previously. The efficacy *vel non* of these financing statements is the major focal point of the present appeal.

During early December of 1974, Hammons and Ball moved their business to Laurel, Jones County, Mississippi. They also adopted a new trade name, Shady Grove T.V. and Appliance, (hereinafter Shady

Grove). On December 3, 1974, the individual partners, d/b/a Shady Grove, entered an inventory security agreement with BWAC. BWAC was similarly secured by a broad after-acquired property clause in the debtors' inventory. The agreement with BWAC contained a power of attorney and guaranty similar to those previously executed in favor of FFC.

BWAC, attempting to ascertain the status of the debtors' previous dealings, if any, sent an information request to the Secretary of State listing as the debtors to be searched:

> "Ball, Donald R. & *Hammonds*, Rex L. individually & as co-partners DBA Shady Grove TV & Appliance Center Rt. 2 Hwy 15 North Laurel, Miss." (emphasis added).

The response dated December 9, 1974, disclosed no prior filings for the debtors. Subsequently, BWAC filed financing statements with the Secretary of State on December 9, 1974, and with the Jones County Chancery Clerk on December 10, 1974. These financing statements were signed by both partners, and the debtor box listing appeared as shown above for the information request.

Thereafter, on December 19, 1974, the first shipment that was financed by FFC was delivered to the bankrupt-debtors at the Jones County location in Laurel. The distributor, Irby, invoiced the goods to the bankrupts' original address in Raleigh. The record on this point is unclear, and the debtors themselves were uncertain as to the reason why and how the shipment arrived at the Laurel location.

On March 3, 1975, Shady Grove, by the individual partners, executed a security agreement with GE. The collateral remained the same, i. e., all inventory, presently owned and after-acquired. GE also filed an information request and was notified by the Secretary of State that there were no outstanding security interests for the debtors, Donald R. Ball and Rex L. Hammons, d/b/a Shady Grove at the Laurel address. GE then filed its financing statement in both Jones County and with the Secretary of State.

Since the Secretary of State's response indicated no prior interests, GE failed to give either BWAC or FFC notice pursuant to U.C.C. § 9–312(3), *Miss. Code Ann.* § 75–9–312(3) (1972), whereby it could have assured itself priority as a purchase money lender of the inventory collateral. During March of 1975, GE had requested information on the debtors' credit history from both FFC and BWAC. However, these requests failed to inform either lender of GE's intention to take a purchase money security interest in the debtor-bankrupts' inventory.

On April 4, 1975, the Regional Finance Manager for FFC noted upon the October 3, 1974 security agreement with Hammons Heating that the same had been "accepted". Also, a typed notation, presumably of even date, indicated the partners' new address in Laurel.

Various other creditors also took security interests in the debtors' property. However, since these varying interests are not at issue, they are merely noted to complete the scenario leading to this appeal.

During December of 1974, Finance America Private Brands entered a security agreement with Hammons Heating. By certified letter dated December 20, 1974, Finance America notified FFC of their intent to take a purchase money security interest in the inventory of Hammons Heating. BWAC was similarly notified by Finance America on August 7, 1975. On April 10, 1975, being aware of the debtors' move and change in trade name, Finance America filed an amended financing statement listing the debtor as Shady Grove at the Laurel address.

Philco Finance Corporation took a similar purchase money interest in Shady Grove's inventory during April of 1975, and notified BWAC of same on June 6, 1975. Philco's interest was assigned to ITT-Diversified Credit Corporation (herein ITT) and a financing statement to that effect was filed on November 4, 1975. BWAC received the customary purchase money notification from ITT on December 19, 1975.

Ariens Credit Corporation entered the picture during July of 1975, and similarly notified BWAC on August 4, 1975. Finally, on January 26, 1976, the Shady Grove partnership entered a security agreement with the First National Bank of Laurel. The bank took an interest in the debtors' accounts receivable, and filed during January of 1976 in order to perfect.

On July 16, 1976, ITT filed a Declaration in Replevin against the debtors seeking a return of the secured collateral in order to liquidate the debt owing to ITT. ITT posted bond and on the same day, the Jones County Circuit Judge issued the order and writ of replevin. The Sheriff of Jones County executed the writ on a portion of the debtors' inventory on July 19, 1976.

On the afternoon of July 19, 1976, Rex L. Hammons and Donald R. Ball, along with their wives, filed voluntary petitions and were adjudicated bankrupts.

Immediately thereafter, BWAC filed a complaint with the Bankruptcy Court in the Southern District of Mississippi naming the above enumerated creditors and the receiver as defendants. BWAC sought a judicial determination as to the superiority of its security interest and an accounting by ITT for the replevied goods.

Each of the defendants answered separately; and counter-claims and cross-claims were interposed. The major thrust of each defendant concerned the alleged superiority of their own individual security interests. ITT, as the assignee of Philco, filed a motion to dismiss the complaint as to ITT alleging that the Bankruptcy Court lacked summary jurisdiction as to the property in ITT's possession. The Bankruptcy Court agreed and entered an order to that effect on October 18, 1976.

The Bankruptcy Court entered its judgment, holding, *inter alia*, that the order and priorities of the perfected security interests was: (1) BWAC; (2) GE; (3) the Trustee. The Court determined the amounts owing to the above named creditors, and further, held that the security interest of FFC was unperfected and therefore subordinate to the interests of BWAC, GE and the Trus-

tee. It is from this decision that FFC appeals.

■ Under Bankruptcy Rule 810, this Court may affirm, modify, reverse or remand a judgment of the Bankruptcy Court. This Court is bound to accept the Bankruptcy Judge's findings of fact unless they are clearly erroneous. Similarly, due regard in this context must be given to the lower court's opportunity to hear firsthand the testimony of the witnesses. However, this same presumption does not apply to conclusions of law, and this Court may make an independent examination and determination of the ultimate legal conclusions to follow from the facts. *In Re McCoy*, 330 F.Supp. 533, 534–35 (D.Kan.1971).

The majority of the Bankruptcy Court's findings of fact are not in dispute and appear essentially as set forth in this opinion. Appellant bases part of its appeal to this Court contesting the following factual determination of the Bankruptcy Court:

"During early December, 1974, Hammons and Ball closed their business location in Raleigh, Mississippi, and opened a new location near Laurel, in Jones County, Mississippi. Fedders attempted to show that the relocated business was simply a continuation of the old business conducted in Raleigh, Mississippi; however, the evidence clearly establishes it as a new business under a new name, *Shady Grove TV and Appliance*, with Rex L. Hammons and Don R. Ball, both serving as active partners. The new business engaged in the sales of televisions, radios, citizens band radios, refrigerators, freezers, electrical appliances, as well as in the air conditioning and sales area."

Appellee BWAC's position is in support of this factual determination. The "clearly erroneous" standard was explained by the Supreme Court in *Comm. v. Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), wherein the Court stated:

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

**1148**

conviction that a mistake has been committed. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395 [68 S.Ct. 525, 542, 92 L.Ed. 746]. The rule itself applies also to factual inferences from undisputed basic facts . . . ." 363 U.S. at 291, 80 S.Ct. at 1200. *Accord, Inland Sec. Co., Inc. v. Kirshner,* 382 F.Supp. 338, 344 (W.D.Mo.1974).

Upon reviewing the entire record in the present case, and upon hearing oral arguments by the parties' respective counsel, and with particular emphasis on the testimony of the two principals, Hammons and Ball, and with due regard for the proceedings before the Bankruptcy Court, this Court is of the opinion that error has in fact occurred.

The original partnership, Hammons Heating and Air Conditioning, was located and transacted business in Raleigh, Mississippi. Ball described himself as a "silent" partner [1] in this enterprise, and the Bankruptcy Court used this fact as part of its determination that Shady Grove was an entirely new business wherein both Hammons and Ball served as active partners.[2]

However, Ball's emergence as an "active" partner does not compel the conclusion that a new business was started. While Mississippi has adopted the Uniform Partnership Act, 1976 Miss. Laws Cpt. 407, the Act is declared to have prospective application only. Therefore, in this case the rules of the common law apply.

■ Absent some limiting agreements among partners, every partner has a common law right to participate in the management and conduct of the business. 60 Am. Jur.2d *Partnership* § 109 at 36 (1972). Moreover, a dormant or "silent" partner has the same general powers possessed by ordinary partners, including the right to act on behalf of the firm in partnership transactions. 59 Am.Jur.2d *Partnership* § 17 at 942 (1971).

That the two bankrupts at least tacitly understood the legal concepts involved is evidenced by FFC's financing statement which was signed by Ball on behalf of the original partnership. Therefore, the distinction between a silent and an active partner is of no significant legal consequence, for Ball at all times had the right to take a more active role in Hammons Heating. *His failure to so act in no way diminished his rights or liabilities as a partner per se.*

On this issue, this Court is also very cognizant of the partners' own explanations regarding the transformation from Hammons Heating to Shady Grove.

■ Upon questioning, Ball initially testified that the partners' business was basically the same, although their inventory had expanded.[3] Moreover, Ball testified that there had never been a dissolution of the partnership. Since the record herein fails to disclose any agreement between Ball and Hammons setting a time limit on their joint enterprise, there was a partnership at will lasting during the mutual consent of the partners. The partners' testimony supports the continuity of the enterprise.[4] Thus, once shown that a partnership

---

1. *E. g.,* First meeting of Creditors, Transcript at 31. (hereinafter T–1). For convenience the proceedings of August 30, 1976, are denominated as T–2.

2. Paragraph 5, Findings of Fact and Conclusions of Law.

3. "Q. Did the nature of your business change from the time you moved from Raleigh to Laurel. Did you engage in the same type of inventory?
   A. Well, our inventory increased after we moved to Laurel. Our business got bigger and so forth.

Q. But basically it was still a heating and air conditioning and appliance business?
A. Yes, sir." T–1 at 11.

4. Questioning by B.W.A.C.'s attorney:
   "Q. And one final question. I understood that Shady Grove TV and Appliance was a completely new business and that you testified to that effect that the—
   A. No sir. We merged the old business into the new business.
   Q. Didn't you testify at the first meeting of creditors 'Q. So this is a completely new business that you and Mr. Hammons were operating together? A. Right."

relation exists, it is presumed to continue until the contrary is shown. 59 Am.Jur.2d *Partnership* § 30 at 953 (1971). Cf., *North Kansas City v. Sharp*, 414 F.2d 359, 366 (8th Cir. 1969) (construction under Missouri law).

The testimony also reveals that Hammons and Ball continued doing business with FFC after the move to Laurel, and that they continued to provide the same services and carry the same lines of merchandise that were offered in Raleigh. It is also interesting to note that after the move to Laurel, in Jones County, the partners continued to do business in Raleigh, Smith County, Mississippi. As a matter of fact this dual operation continued until bankruptcy.[5]

▆▆▆ The record herein is replete with evidence indicating that Shady Grove was not a "new" business, but rather, an expanded version of the enterprise initially labeled Hammons Heating. In a matter such as this, the testimony of the partners themselves, uncontradicted on the face of the record, clearly shows a continuing business entity. A finding directly contrary to the only testimony presented is properly considered to be "clearly erroneous". See, *Morris Plan Industrial Bank v. Finn*, 149 F.2d 591, 592 (2d Cir. 1945). Finally, this Court is unable to accept the contention that an expansion of inventory to include new lines of merchandise thereby produces a "new" or legally distinct business entity.[6] Therefore, based upon the foregoing, this Court holds that Shady Grove TV and Appliance was not a "new" partnership, but a continuation of Hammons Heating and Air Conditioning, the original partnership of Rex L. Hammons and Don R. Ball.

Pursuant to Bankruptcy Rule 806, appellant has framed the remaining issues on appeal as follows:

"1. Whether the Bankruptcy Judge erred in finding that the Appellant's secured interest in the collateral was

---

"A. That question was asked there in a way that was misleading. The question was asked, was this the first business of this type that I have ever operated on my own . . . .. It was a new business that I was operating, true enough; but it was a continuation of the Hammons Heating and Air Conditioning which also was a new business. We had just gone into both of them.

Q. [But did you not testify] . . . that this was a completely new business that you and Mr. Hammons were operating together as the Shady Grove TV and Appliance?

A. It wasn't—I might have answered that way but it would be misleading to say that because it was actually a mergence of the business he had been operating because we were still doing the heating and air and he had built a good reputation in doing that type work. We just merged it together.

Q. What you're saying, he merged his business in with your business which was—

A. No, sir. I was involved in his business too. I was a silent partner even though I wasn't active in operating it.

Q. But you say 'merged' you mean you took his old business and added in the appliance sales and TV's and that kind of thing and that was the new business.

A. More or less combining it all together, yes, sir." T–2 at 52–54.

**5.** Testimony of Donald Ball, questioning by counsel for FFC.

"Q. Now, after you moved to Laurel, Mississippi, you moved the partnership over there, you were still doing some business over there in Raleigh, Mississippi.

A. We did it anywhere we could do it. Anywhere we could get a job, we did it because we were hungry. We needed the work.

Q. So, you were doing business, then, for a period of time in both counties.

A. We were, up until the time we closed. We had a job going in Smith County at the time we closed.
. . .
Q. And it was the same partnership; the same people were involved.

A. Yes, sir." T–2 at 45–6.

**6.** In a case factually distinguishable from the instant case, the Mississippi Supreme Court addressed the contention that two separate businesses operated by the same partners were legally distinct.

"A partnership with identical partners under one partnership name is the same partnership when conducting some other portion of its business under another name,—whatever the name, there is still the same partnership. . . . [O]wnership and ultimate control are still in the partners who compose the firm."

*Fidelity Phoenix Fire Ins. Co. v. Howard*, 182 Miss. 546, 181 So. 846 (1938).

not perfected by virtue of filing their financing statement in Smith County rather than Jones County, in accordance with *Miss.Code Ann.* § 75–9–401 (1972).

2. Whether the Bankruptcy Judge erred in finding that the Appellant's secured interest in the collateral was not perfected by filing in the original name of the creditors."

The Bankruptcy Judge, in addressing the issues below, concluded that FFC had an unperfected security interest because:

1. FFC failed to file its financing statement in Jones County, the debtors' place of business when the first FFC financed shipment was delivered;

2. At the time of this first shipment, FFC had actual knowledge of the bankrupts' new address and trade name;

3. The financing statement as filed was defective because it was signed only by Donald R. Ball for Hammons Heating;

4. The debtor's name as listed on the FFC financing statement was "seriously misleading" within U.C.C. § 9–402(5);[7]

5. FFC breached its duty of good faith under U.C.C. § 1–203[8] by failing to amend, or file a new financing statement listing Shady Grove at the Laurel address; and,

6. FFC never filed in Jones County.

The Bankruptcy Court also concluded that U.C.C. § 9–401(3)[9] was inapplicable because:

1. The bankrupts did not move any inventory financed by FFC from Smith to Jones County;

2. All FFC financed collateral was delivered to Shady Grove in Laurel, Jones County, Mississippi;

3. FFC's "after-acquired" property clause would only apply to collateral delivered to the bankrupts' Smith County location, and no collateral was so delivered; and,

4. The original filing by FFC in Smith County was not in the proper place, given the existence of the Jones County store.

Appellant's primary contention is that the conclusions of the Bankruptcy Judge were in error and that, FFC, not BWAC, is entitled to first priority as to the bankrupts' collateral.

The first issue to be addressed is whether FFC filed its financing statement in the correct county initially. This question should not be confused with the bankrupt-debtors' subsequent change of location. This is a distinct issue and is discussed separately, *infra*.

■ During October of 1974, Hammons Heating entered the security agreement with FFC. The financing statements were filed that same month. The record herein shows that during this time frame, the debtors were doing business in Smith County. The Laurel, Jones County store was not operational until mid-December of 1974.[10]

The U.C.C., *Miss.Code Ann.* § 75–9–401 (1972) provides that the proper place to file in order to perfect a security interest is:

"(c) in all other cases, in the office of the secretary of state and in addition, if the debtor has a place of business in only one (1) county of this state, also in the office of the chancery clerk of such county . . . ."

---

7. U.C.C. § 9–402(5) provides:

"A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading."
*Miss.Code Ann.* § 75–9–402(5) (1972)

8. *Miss.Code Ann.* § 75–1–203 provides:

"Every contract or duty within this code imposes an obligation of good faith in its performance or enforcement."
Furthermore, *Miss.Code Ann.* § 75–1–201(19) defines good faith as " . . . honesty in fact in the conduct or transaction concerned."

9. *Miss.Code Ann.* § 75–9–401(3) provides in pertinent part:

"[A] filing which is made in the proper place in this state continues effective even though the debtor's residence or place of business or the location of the collateral or its use, whichever controlled the original filing, is thereafter changed."

10. Testimony of Rex Hammons, T–2 at 55–56.

Therefore, since at the time when FFC filed its financing statement the debtors had their sole place of business in Raleigh, the Chancery Court filing in Smith County was proper.

The conclusion that the filing was initially made in the correct county does not end this Court's inquiry. It is also contended that because the FFC financing statement listed the debtor as Hammons Heating, along with the individual partners as set forth above, that the filing was thereby rendered ineffective.

*Miss.Code Ann.* § 75–9–402(1) does not expressly require the financing statement to set forth the debtor's name. However, the proposed form for financing statements does make provision therefor. *Id.* § 75–9–402(3). Much controversy has arisen, and the cases also make clear that the debtors' proper name be listed.

■ The U.C.C. further provides that substantial compliance in listing the debtor is effective if not *seriously misleading*.[11] As indicated, the debtor box on the FFC financing statement listed the trade name and the individual partners. Under the U.C.C., the clerk's duty is to index the name or names of the debtor(s) as they are listed by the creditor. *Miss.Code Ann.* § 75–9–403(4). In the instant case, all three names were given. The clerk is under no duty to index according to the name appearing on the signature line of the financing statement, here Don Ball. *In Re Platt*, 257 F.Supp. 478 (E.D.Pa.1966). *Cf. In Re Fowler*, 407 F.Supp. 799 (W.D.Okl.1975).

■ Nor is the secured party an insurer of proper indexing. Presentation of the financing statement and acceptance by the filing officer constitutes filing under the U.C.C. *Miss.Code Ann.* § 75–9–403(1).[12] *See e. g., In Re May Lee Indus., Inc.*, 380

F.Supp. 1 (S.D.N.Y.), *aff'd*, 501 F.2d 1407 (2d Cir. 1974). Thus, FFC was properly "filed" under the code even though BWAC failed to receive notice to that effect pursuant to its information request.[13]

BWAC contends, nevertheless, that the listing of Hammons Heating on the financing statement was seriously misleading within *Miss.Code Ann.* § 75–9–402(5). The U.C.C. has adopted the concept of "notice" filing, and the purpose of such notice is to indicate merely that " . . . the secured party who has filed *may* have a security interest in the collateral described." Official Comment 2, U.C.C. § 9–402; *Owen v. McKesson-Robbins Drugs*, 349 F.Supp. 1327 (N.D.Fla.1972). Therefore, the proper inquiry is whether the listing by FFC was such that it would put subsequent creditors on notice, or, whether it was in fact seriously misleading.

In *In Re Firth*, 363 F.Supp. 369 (M.D.Ga. 1973), the financing statement listed the debtor as National Photocopy Equip. Co. This was James Firth's trade name. The court held the filing defective for no one searching the records for Firth would find the trade name listing. *In Re Hill*, 363 F.Supp. 1205 (N.D.Miss.1973), similarly invalidated a financing statement which listed only the debtor's trade name, "Carolyn's Fashions", and not the real debtor, Carolyn Hill.

■ The rule from these and similar cases is that filing under a trade name only is generally defective where the trade name materially differs from the debtor's real name. *E. g., In Re Thomas*, 466 F.2d 51, 53 n. 3 (9th Cir. 1972) (listing under West Coast Avionics, no indication of true debtor B. H. Thomas); *In Re Leichter*, 471 F.2d 785 (2d Cir. 1972) (listing under Landman

---

11. See footnote 7, *supra.*

12. The official comment to U.C.C. § 9–407 states:

"  .  .  .  the secured party does not bear the risk that the filing officer will not properly perform his duties  .  .  .."

13. The evidence tends to indicate that the filing officer indexed the debtors under more than merely the trade name of Hammons Heating. The record, Exhibit O, shows that the information request dated July 30, 1976, revealed every financing statement filed by all the creditors herein for the bankrupt-debtors, Ball and Hammons.

Dry Cleaners, no indication of true debtor M. R. Leichter). Appellees have cited one case wherein the court went so far as to invalidate a financing statement listing the debtor as Kaplas, where the annexed security agreement showed the correct name of Kaplan. *Bank of North America v. Bank of Nutley*, 94 N.J.Super. 220, 227 A.2d 535.[14]

■ However, such is not the case here. Filing under a trade name may be effective if not misleading. *Siljeg v. Nat'l Bank of Commerce*, 509 F.2d 1009, 1012 (9th Cir. 1975). In the present case, not only were all three possible names listed as debtors, but the trade name, Hammons Heating, corresponded exactly to the real name of one of the partners. A subsequent creditor upon seeing a listing for Hammons Heating would be put on notice that further inquiry was necessary.[15]

In *Nat'l Cash Reg. Co. v. Firestone*, 346 Mass. 255, 191 N.E.2d 471, the court upheld the validity of a financing statement listing the debtor as "Cozy Kitchen", rather than "Kozy Kitchen". The court held that the misidentification was not material because the financing statement also gave the correct name of the individual debtor.

*In Re Platt*, 257 F.Supp. 478 (E.D.Pa. 1966) is also illustrative of the correct principle to be applied in the present case. In *Platt*, the creditor's financing statement listed the debtor as Platt Fur Co. That court held that the debtor's trade name was ". . . sufficiently related to the name of the debtor, Henry Platt, to require those who search the records to make further investigation . . . " 257 F.Supp. at 482.

In *In Re Fowler*, 407 F.Supp. 799 (W.D. Okl.1975), the debtor's box of the financing statement listed the debtors as:

Kaw Lake Cement
Fowler, J. A., Partner
Fowler, Jerry A., Partner

The court rejected the trustee's contentions as to the invalidity of the financing statement and stated:

". . . the general rule can be formulated that a financing statement, in order to perfect a security interest, must, in the case of an individual, or individuals, doing business under a trade name show the name of the individual legally responsible for the debt unless the trade name and the individual debtor's name are so similar that a prospective creditor, upon seeing the trade name in the records, would be alerted that there might be a prior security interest in the involved collateral." 407 F.Supp. at 803.

As in *Fowler, supra*, FFC's financing statement showed the trade name and the

---

**14.** The Court notes this because appellee BWAC's own financing statements list the debtor as Rex L. *Hammonds*, whereas right below that listing the debtor signed his name correctly as *Hammons*.

**15.** As mentioned previously, *supra*, at nn. 12–13, errors of the filing officer are not attributable to the secured party. Therefore, BWAC's claim that the information request revealed no prior financing statements for Hammons or Ball is, although regrettable, not relevant.

Some courts seek to place the duty to inquire on subsequent creditors.

"Finally, it was not intended that an interested inquiring party be completely absolved from any inquiry as to the past history of the debtor . . . . .

Thus, an interested inquiring party must determine from available sources all of the places where the debtor did business or resided during the life of the collateral in question . . . . ." *In Re Gac*, 11 U.C.C.Rep. Serv. 412, 414 (W.D.Mich.1972).

Nothing in the present record indicates that BWAC or GE made any inquiry of the debtors themselves as to past businesses or encumbrances. If this had been done, the present litigation would probably not have arisen. BWAC could have then assured itself of priority as a purchase money lender. See *Miss. Code Ann.* § 75–9–312(3).

Finally, Exhibit N of the record herein discloses that on December 20, 1974, Finance America Private Brands, Inc., sent FFC notice of their intent to take a purchase money security interest in the debtors' inventory. What the record fails to disclose is how Finance America learned of FFC's prior interest. The two possibilities are apparent, *i. e.*, they either asked the debtors or they filed an information request with the Secretary of State which disclosed FFC's financing statement.

individual names of the partner-debtors.[16] And, as in *Platt, supra,* the trade name Hammons Heating was so close to the name of the true debtor, Rex Hammons, that subsequent creditors would be put on notice. Accordingly, this Court holds that the listing of debtors in the financing statement of FFC was not misleading, and was therefore effective.

The Bankruptcy Court also concluded that FFC's financing statement was defective because it was signed only by Donald Ball. The court reasoned that Hammons Heating was the debtor, and since only one partner signed, the financing statement accordingly had not been "signed by the debtor" as required by *Miss.Code Ann.* § 75–9–402(1). Once again, this Court finds itself in disagreement with the conclusion as rendered below.

In *In Re Excel Stores,* 341 F.2d 961 (2d Cir. 1965), the financing statement was signed by the authorized treasurer of the corporate debtor. The court held the financing statement was "signed by the debtor" within U.C.C. § 9–402(1). In *Plemens v. Didde-Glaser, Inc.,* 244 Md. 556, 224 A.2d 464, the president of the corporate debtor signed the financing statement without indicating any representative capacity. The court held that the financing statement was "signed by the debtor" within U.C.C. § 9–402(1).

■■ These cases are sufficiently analogous to the present case to provide the proper resolution of this issue. A financing statement is intended to provide notice only, it is not intended to have the legal sufficiency of a security agreement or other contract.[17] To affirm the Bankruptcy Court on this point would be to exalt form over substance; and the U.C.C. is to be liberally construed and applied so as to promote its underlying purposes and policies. *Miss.Code Ann.* § 75–1–102(1). In point of fact, an overly strict construction of 9–402(1) would run directly counter to the express understandings of the drafters of the U.C.C.[18]

This is certainly not a case wherein the debtor's signature has been omitted entirely. Indeed, some of appellee's own authority states that not all partners need sign the financing statement. *E. g., In Re Lockwood,* 16 U.C.C.Rep.Serv. 195 (D.Conn. 1974); *In Re Holmes,* 9 U.C.C.Rep.Serv. 1160 (W.D.Mich.1971).

This issue may also be answered in another fashion. *Miss.Code Ann.* § 75–1–103 provides that:

"Unless displaced by the particular provisions of this code, the principles of law and equity, including . . . principal and agent . . . shall supplement its provisions."

U.C.C. § 9–402(1) merely requires the financing statement to be signed by the "debtor". The code in no way defines debtor, thus the common law may be used to supplement the code provisions applicable here.

■■ The ordinary rules of agency govern the liability of one partner for the

---

This Court similarly rejects the assertion of Appellant that BWAC was under a duty to check the records in Smith County.

**16.** The court in *Fowler* noted that the financing statements had only been indexed under the trade name, Kaw Lake Cement. Nevertheless, it concluded:

"... The Clerk should have indexed all three listings and the appellee [Bank] did not lose its security agreement because of the Clerk's omission." 407 F.Supp. at 804 n. 6. See also text at nn. 12–13, *supra.*

**17.** Both Hammons and Ball signed the FFC security agreement. The only claim of inadequacy is directed to the failure of Rex Hammons to join in the execution of the financing statement.

**18.** Official Comment 2 to U.C.C. § 9–402 states that the Code adopts notice filing. The failure of Rex Hammons to also sign the financing statement does not detract from the ability of the financing statement itself to impart notice to interested parties. Also, the Official Comments discourage the construction urged by appellees.

"[It is] the policy of this Article [9] to simplify formal requisites and filing requirements and is designed to discourage the fanatical and impossibly refined reading of such statutory requirements in which courts have occasionally indulged themselves." Official Comment 9, U.C.C. § 9–402 (1972 Revision).

actions of another partner. *Idom v. Weeks,* 135 Miss. 65, 99 So. 761 (1924).[19] And it is also true that a partner has the power to bind the partnership as to matters within the scope of the partnership business. *Picone v. Comm'l Paste Co.,* 215 Miss. 114, 60 So.2d 590 (1952); *Idom v. Weeks, supra.* The acts of Ball are attributable to Hammons, subjecting the latter to legal liabilities by virtue of the very nature of partnership obligations.[20] Therefore, this Court finds that the financing statement filed by FFC was "signed" by the debtor within *Miss.Code Ann.* § 75–9–402(1) (1972).

■ Also raised as error by FFC are the Bankruptcy Court's conclusions that FFC was unperfected because of its failure to amend or file a new financing statement after learning of the debtors' change in name and address. FFC contends that *Miss.Code Ann.* § 75–9–401(3)[21] applies to the present case. For the reasons hereinafter stated, this Court agrees with Appellant, FFC.

Approximately two months after FFC's filing in Smith County, the debtors moved to Jones County. This Court has already determined that FFC's financing statement was initially filed in the correct county.

U.C.C. § 9–401(3), by its express terms, governs the present situation. Once a financing statement is filed in the proper place, it remains effective even though, as here, the debtor subsequently changes locations. The emphasis and import of U.C.C. § 9–401(3) to the present case is not on the collateral, as contended by the Appellee. In the present case, the original filing was governed by the bankrupt-debtors' place of business. The location of the collateral did not govern the original filing and therefore, its subsequent movement does not alter the applicability of U.C.C. § 9–401(3). The

Bankruptcy Judge was, therefore, incorrect in concluding that U.C.C. § 9–401(3) was inapplicable because no collateral was physically moved from Smith *to* Jones County.

The Bankruptcy Court also held U.C.C. § 9–401(3) inapplicable because the FFC financed collateral was delivered to the debtors' Jones County location. The Bankruptcy Judge also concluded that the after-acquired property clause of FFC would only apply to collateral delivered to the debtors' original location in Smith County. This Court can not agree with either conclusion.

The first conclusion is unwarranted under this Court's previous analysis, *i. e.,* the debtors' location and not the collateral controlled the original filing by FFC. This Court's conclusion may be illustrated by example. If a debtor has his place of business in only one county, as herein initially, local filing in that county is necessary. U.C.C. § 9–401(1)(c). If such a debtor does volume business, warehousing facilities are necessary. Now, what is the proper conclusion if such a debtor warehouses his goods across the county line? And, if the secured creditor delivers goods to the debtor at that warehouse? The only tenable conclusion under the U.C.C. is that the creditor, by filing where the debtor has his place of business, is perfected. And, this perfection attaches to those goods delivered to the warehouse. In such a case, the actual location of the collateral does not affect the originally effective filing. Were such not the proper conclusion, secured creditors would have to file in every county where the debtor has or keeps the secured collateral. Such a conclusion is unwarranted and rejected by the code.

The use of "after-acquired" property clauses, as used by the creditors involved herein,[22] is expressly sanctioned by the

---

**19.** This common law rule is embodied in § 9(1) of the Uniform Partnership Act, Gen.Laws Miss.1976, Cpt. 407.

**20.** It might be noted that U.C.C. § 9–402(5) has relevance here also. The financing statement of FFC was in substantial compliance with § 9–402. Although it contained a "minor error", the lack of Hammons' signature, this

omission does not make the financing statement "seriously misleading".

**21.** See footnote 9, *supra.*

**22.** For example, FFC took a security interest in the following collateral of the debtors, both presently owned and after-acquired:

U.C.C. *Miss.Code Ann.* § 75–9–204(3). There is nothing in the code that limits the effectiveness of an after-acquired property clause to only that collateral delivered to a debtor's original business location.[23] *In Re Little Brick Shirthouse*, 347 F.Supp. 827 (N.D.Ill.1972); *In Re McCoy*, 330 F.Supp. 533 (D.Kan.1971). The security interest in after-acquired property is not merely an equitable interest, but is enforceable according to its terms among the parties to the agreement. See Official Comment 1, U.C.C. § 9–204 (1972 Revision). Moreover, such clauses do not require further action by the secured creditor in order to maintain a perfected status. Official Comment 1, *supra*; 4 Anderson, *Uniform Commercial Code* § 9–204:9 at 182 (1971). Therefore, the after-acquired property clause of FFC can not be held to be limited and effective only as to the collateral delivered to the original Smith County location. It also attached to the inventory collateral at the Jones County store.

The Bankruptcy Judge also concluded that FFC breached its duty of good faith [24] because it failed to file a new or amended financing statement in Jones County listing Shady Grove as the debtor at the new Laurel address.

■ An alternative provision to U.C.C. § 9–401(3) requires that where the circumstances controlling the initial filing subsequently change, the secured party has four months in which to refile, to retain continuity of perfection. This alternative was rejected in Mississippi. Therefore, the initial filing of FFC, which was made in the proper place, remained effective even though the debtors' place of business, which controlled the original filing, was subsequently changed. *Miss.Code Ann.* § 75–9–401(3).

■ The case authority also supports this conclusion. See e. g., *In Re Little Brick Shirthouse, supra; In Re McCoy, supra.* Since financing statements are only intended to impart notice, subsequent creditors should not necessarily rely on the debtor's address as given to accurately reflect the debtor's correct, present address. *In Re Smith*, 508 F.2d 1323 (5th Cir. 1975). The key to the correct application of U.C.C. § 9–401(3) is on the validity of the secured parties' initial filing, which this Court has already concluded was proper.

■ This Court must still address the issue of the bankrupt-debtors' change of name and its affect on appellant's financing statement. Under the 1972 amendments to the U.C.C., some states have enacted § 9–402(7).[25] This new provision seeks to eliminate many of the problems presented by the instant case. The principle objective is to require refiling by the secured creditor within four months after the debtor changes his name in such a way that the original filing becomes seriously misleading.[26]

In *Continental Oil Co. v. Citizen's Trust & Sav. Bank*, 57 Mich.App. 1, 225 N.W.2d 209, *aff'd*, 397 Mich. 203, 244 N.W.2d 243, the debtor changed its corporate name after the original financing statement was filed. The court held that the secured creditor was under no duty to refile a financing statement to reflect the change, even though the secured creditor had knowledge of the change. It should be noted that

---

"Air conditioners, dehumidifiers, convectors, unit heaters, heating equipment, ranges, refrigerators, freezers, washers, ironers, dryers, television sets, hi-fidelity sets, dishwashers, sewing machines, and other domestic and commercial appliances . . . ." It is readily apparent that the security agreement secured more than the heating and air units generally sold or financed by FFC.

23. As to the validity of after-acquired property clauses in general, *see*, 69 Am.Jur.2d *Secured Transactions* § 340 at 175–77 (1973).

24. See footnote 8, *supra*.

25. U.C.C. § 9–402(7) provides in pertinent part: " . . . Where the debtor so changes his name . . . that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed [within] that time."

26. Official Comment 7, U.C.C. § 9–402(7) (1972 Revision).

Michigan, like Mississippi, did not enact the proposed addition to Article 9, § 9–402(7).

Also the debtor's name change in *Continental Oil, supra,* was as marked as in the present case, *i. e.,* from "South Haven Fruit Exchange" to "Blossom Trail Growers, Inc." This is comparable to the change from "Hammons Heating" to "Shady Grove".

Appellee has cited *In Re Kalamazoo Steel Process, Inc.,* 503 F.2d 1218 (6th Cir. 1974), in support of its position. In *Kalamazoo Steel,* the security agreement itself noted the parties' understanding that both the debtor and secured party were to change their respective corporate names. The financing statement was filed under the debtor's then existing name. Bankruptcy intervened and the referee concluded the security interest was not perfected. The Sixth Circuit upheld the trustee's position and stated:

> "We simply hold . . . that a secured creditor, having knowledge at the time of the execution of the security agreement, that the debtor contemplates at a future time changing its name . . and nevertheless proceeds to extend credit knowing that the original filing of a financing statement will not reflect the change and will therefore mislead and deceive potential creditors and purchasers, forfeits his protected interest when the change of name occurs unless he perfects by filing under the Code . . . ." 503 F.2d at 1224.

It should be noted that the instant case does not present the identical situation wherein the parties to a security agreement contemplate that the debtor is to undergo a name change. The record in this case fails to disclose either the "understanding" that was so blatantly apparent in *Kalamazoo Steel,* or, a tacit understanding or agreement whereby FFC knew that Hammons Heating was to become Shady Grove.

Secondly, the Sixth Circuit reserved ruling on the exact issue now before this Court.

"We do not have a case now before us requiring a determination of the responsibilities of a secured party where he learns of a name change at a later time." 503 F.2d at 1222.

Moreover, the instant case involves a change in the debtor's trade name, as opposed to a change in corporate identification. The distinction is important because all of the secured parties involved herein listed either Hammons Heating or Shady Grove as the debtor entity. But, the relevant financing statements also listed the individual debtors, Ball and Hammons. In *Kalamazoo Steel,* the name change precluded a subsequent creditor from ascertaining the existence of the initial security agreement. In contrast, the financing statements filed in this case call for a different conclusion. Thus, *Kalamazoo Steel* is both factually and legally distinguishable.

This Court therefore concludes that under *Miss.Code Ann.* § 75–9–401(3), the security interest of FFC remained effective notwithstanding the debtors' subsequent move and name change. This is to say that under the U.C.C., as enacted in Mississippi, FFC was under *no affirmative duty* to amend its financing statement or to refile in Jones County. To hold otherwise would be, in essence, to preempt the legislature's prerogative. The 1972 amendments to the U.C.C. were, presumably, considered by the legislature. The failure to enact § 9–402(7) indicates the legislative belief that conditions did not warrant the change. The regrettable situation presented here discloses that further consideration may be warranted. The end result here is that secured creditors who could have assured themselves of priority as purchase money lenders are forced to take subordinate priority positions in a bankruptcy estate with insufficient assets to cover all secured claims. Also, this Court can not conclude that FFC breached its duty of good faith under U.C.C. § 1–102. There is no true question of "dishonesty" here by any secured party.[27] Creditors are entitled to rely on the U.C.C. as enacted in this State. There can be no

---

**27.** See footnote 8, *supra.*

 

breach of the duty of good faith for failing to do an act or acts that the code specifically states need not be done.[28]

■ The remaining issue to be considered is the order of priority among the secured creditors. All of the parties involved herein perfected by filing, therefore, *Miss.Code Ann.* § 75–9–312(5)(a) applies. That section states that priority accrues:

"in the order of filing if both are perfected by filing, regardless of which security interest attached first under Section 9–204(1) and whether it attached before or after filing."

Appellees stress the fact that FFC did not "accept" the security agreement with Ball and Hammons until April 4, 1975, some months after the partners' security agreement with BWAC. Appellee argues further that FFC's security agreement did not therefore *attach* until after BWAC had already perfected its interest; thus, entitling BWAC to first priority *vis-a-vis* FFC.

Appellees' argument overlooks the express wording of § 9–312(5)(a). A financing statement may be filed *before* the security interest itself attaches. The relevant inquiry is therefore not on the time the competing security interests attached, but rather, the order and time of filing. *In Re Rivet*, 299 F.Supp. 374 (E.D.Mich.1969). *See* Official Comment 5, Example 1, § 9–312 (1972 Revision).

In the present case, FFC filed financing statements with the Secretary of State and the Smith County Chancery Clerk on October 14, 1974, and October 22, 1974, respectively. Appellee BWAC filed on December 9 and December 10, 1974. GE filed to perfect on March 4, 1975. Accordingly, since this Court has determined that Appellant FFC was properly perfected as to the bankrupt-debtors' inventory collateral, FFC is thereby entitled to first priority under *Miss. Code Ann.* § 75–9–312(5)(a).

For the reasons stated hereinabove, the decision of the Bankruptcy Court is hereby reversed, and the same is hereby remanded for further proceedings not inconsistent with this opinion.

The attorneys may submit an order in accordance with this opinion within the time allowed by the local rules.

---

28. After this decision was rendered, it came to the Court's attention that many of the suggested revisions contained in the 1972 U.C.C. were adopted by the Mississippi Legislature. These changes, effective April 1, 1978, are merely noted and in no way affect the outcome of the present appeal. Gen. Laws Miss. 1977, Cpt. 452. (footnote by the Court).